IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |
|---|---|
| TERRI L. SMYTH-RIDING, | * |
| Plaintiff, | * |
|  | * |
| v. | * |
|  | *     CIVIL NO.: WDQ-11-0558 |
| SCIENCE AND ENGINEERING SERVICES, INC., *et al.*, | * |
| Defendants. | * |
|  | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Terri L. Smyth-Riding sued Dr. Hyo Sang Lee and Science and Engineering Services, Inc. ("the Defendants") for discriminatory employment practices and termination under 42 U.S.C. §1981 and 42 U.S.C. 2000e-2, or, in the alternative, for retaliation under 42 U.S.C. 2000e-3.  Pending is the Defendants' motion for summary judgment.  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2011).  For the following reasons, the motion will be granted in part and denied in part.

I.  Background[1]

Smyth-Riding is a 39-year-old African-American female.  ECF
No. 41 at 1.  In June 2007, Smyth-Riding applied for a human
resources position with Science and Engineering Services, Inc.
("SESI").[2]  SESI, founded by Dr. Hyo Sang Lee in 1988, is a
Maryland corporation specializing in scientific research and
development.  ECF Nos. 41 at 4; 64-1 at 2.  SESI's headquarters
are in Columbia, Maryland.  ECF No. 64-1 at 2.  The company's
research and development laboratory is at the Columbia facility.
*Id.*  SESI has a manufacturing facility in Huntsville, Alabama.[3]
*Id.*

On June 4, 2007, the Defendants offered Smyth-Riding the
position of Director of Human Resources.  *See* ECF No. 70-11.  The
Director of Human Resources handled "recruitment and selection,
benefits administration, HR policy administration, and employee
relations."  ECF No. 41 at 6; *see* ECF No. 70-11.  Although Smyth-

---

[1] The facts are taken from the second amended complaint, ECF No.
41; the Defendants' motion, ECF No. 64, Smyth-Riding's
opposition, ECF No. 70, the Defendants' reply, ECF No. 80, and
their supporting exhibits.  In reviewing a motion for summary
judgment, the nonmovant's evidence "is to be believed, and all
justifiable inferences are to be drawn in [her] favor."  *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2] Smyth-Riding has over fifteen years of experience in the human
resources field.  ECF No. 41 at 1.

[3] The Huntsville facility is 825,000 square feet, including
hanger space, and the Columbia facility is 32,000 square feet.
ECF No. 64-1 at 2.

Riding's position was based in Columbia, she oversaw the human resources work for all of SESI and made regular trips to the Huntsville facility. *See* ECF Nos. 70 at 7-8; 70-3 at 155 (deposition of Smyth-Riding).  Smyth-Riding's salary was $120,000 per year.  ECF No. 64-1 at 13.

Until January 2008, Smyth-Riding's direct supervisor was Lee.  ECF No. 41 at 5.  From January 2008 to January 2009, Smyth-Riding was supervised by Dr. Robert Serino, SESI's Director of Operations.  *Id.*  As the Director of Human Resources, Smyth-Riding "observed, was privy to, and, in some cases, was instructed to participate in a variety of unlawful discriminatory practices."  ECF No. 41 at 1.

A. Allegedly Sexist Practices

During Smyth-Riding's interview for the Director of Human Resources position, Russell Chunn, SESI's Chief Financial Officer, asked her if she had any children and if she planned to have any more.  ECF No. 70-3 at 7-8.  Lee asked Smyth-Riding how old she was, and, when Smyth-Riding "informed [] Lee that such a question was improper during an interview," Lee insisted that she answer the question.  *See* ECF No. 70 at 8.  After taking the position at SESI, Smyth-Riding learned that the Defendants asked

3

about the family status of another female employee during her
interview.[4]  *Id.*

Smyth-Riding asserts that these interview questions were
reflective of the pervasive, sexist culture at SESI.[5]  *See* ECF
No. 70 at 8-10.  Monica Best, another female employee, informed
Smyth-Riding that "she was afraid to inform [] Lee that she was
pregnant because she was afraid he would fire her."  *Id.* at 10.
A third employee, Corrine Benjamin, was told by her supervisor,
Daniel Joe,[6] that she became pregnant at "the worst possible
time" and was removed from a government contract project.  *Id.* at
11.  As an April Fools' joke, Stephanie Arnold told Joe that she
was pregnant.  *Id.*  Joe began treating Arnold poorly, and, when

---

[4] General Randal Castro, SESI's Senior Vice President, recalled
that Smyth-Riding raised an issue about the way a female
candidate was questioned at an interview and told him that the
applicant "felt that because she was female, may have to take
care of kids at home . . . we may have given her the impression
that [she] wouldn't be welcomed in this environment."  ECF No.
70-6 at 7-8.

[5] The Defendants argue that Smyth-Riding's accounts of pregnancy
discrimination and age discrimination are irrelevant in this case
because Smyth-Riding was not a protected member of either of
these classes.  *See* ECF No. 80 at 5.  However, Smyth-Riding
presents these factual accounts as support for her arguments that
the Defendants treated women differently and preferred "young,
attractive, female employees."  ECF No. 70 at 8.  Even if these
facts were irrelevant to her substantive discrimination claims,
Smyth-Riding is also asserting retaliation claims for objecting
to these practices.  *See* ECF No. 41 at 22-34.

[6] Daniel Joe, SESI's Director of Finance, is of Asian descent.
ECF No. 41 at 6.

Arnold informed him that she had been joking, Joe stated, "I should punch you in the face." Smyth-Riding reported the incident to General Randal Castro, SESI's Senior Vice President.[7] *Id.* Smyth-Riding also "expressed her concerns that a woman would feel uncomfortable to share the news of her pregnancy to [] Serino."[8] *Id.*

When Smyth-Riding was helping with recruitment and selection of new employees, "Serino informed [her] on a number of occasions that [] Lee wanted to hire young, attractive, employees." *Id.* at 8-9. On one occasion, Lee returned an application for an Executive Assistant position with "too old" written on it.[9] *Id.* at 8. Another time, Serino brought a stack of job applications for a Receptionist and Executive Assistant position into Smyth-Riding's office, tore them up, and stated, "They're all too old." *Id.* Serino wanted applicants "right out of high school" and said

---

[7] Castro does not remember Smyth-Riding ever discussing race or gender discrimination with him. ECF No. 70-6 at 33. However, Castro admits that she did bring age discrimination to his attention, mentioned that she was worried about the company's hiring practices, and discussed specific incidents in which the hiring practices bothered her. *Id.* at 33-34.

[8] Although the parties do not provide the various dates of these events, the comments to Serino likely occurred between January 2008 and January 2009 when he was Smyth-Riding's supervisor.

[9] The Defendants assert that none of the sexist comments alleged by Smyth-Riding occurred except this one. The Defendants admit that Lee wrote "too old" on the application, but contend that he meant "too experienced and expensive." *See* ECF No. 70-13 at 221-23.

that it did not matter if they could use a computer.  *Id*.  Serino
also asked if any of "the young ladies we interviewed before
[were] attractive to the eye?"  *Id*.  When Smyth-Riding brought
Serino a male applicant for the position, Serino stated that
"[w]e're not going to have any male candidates" and "men don't
belong behind a desk."[10]  *Id*. at 9.  Castro remembers that Smyth-
Riding expressed a "concern that we were only looking for young,
good-looking women and not opening the pool to anybody that was
qualified."  ECF No. 70-6 at 11.

Lee's son, who was also an employee of the Defendants, also
made comments about receptionist applicants.  *Id*. at 10.  He
asked Smyth-Riding if he could bring in women for interviews
"just. . . to pick them up."  *Id*.  When Smyth-Riding recommended
an older woman for an Executive Assistant position,[11] Lee's son
stated that the applicant "was not the person to be sitting
outside my dad's office.  Look at her."  *Id*.

Smyth-Riding contends that she experienced this sexist
culture first-hand.  When Smyth-Riding went to Serino and
requested additional supervisory responsibilities over the
administrative staff, Serino rejected the request because Smyth-

---

[10] When the Defendants were hiring a Configurations Analyst
Manager, Serino told Smyth-Riding that he was hiring a male
applicant because the applicant "would get along better with the
team."  ECF No. 70 at 9.

[11] According to Smyth-Riding, the applicant, Marjorie Taylor, was
African American and about 40 years old.  ECF No. 41 at 15.

Riding's "estrogen added to the other women's estrogen would be too much." *Id*. at 9-10. During a conversation related to a business decision, Serino told Smyth-Riding that she "wouldn't understand . . . this is gentlemen stuff -- guy stuff." *Id*. On another occasion, Serino told Smyth-Riding that "women don't do as they are told, but rather whatever they want despite direction from a man." ECF Nos. 41 at 8; 70 at 10.

On another occasion, Lee called Smyth-Riding into his office to discuss an employee policy. ECF No. 64-2 at 11. Lee was very upset and during the conversation asked Smyth-Riding "[w]hy are you looking at me like that?" and told her to "[s]top looking at me and sit down." *Id*. During a trip to the Huntsville facility, Smyth-Riding talked about this incident with another female employee, Yanmei Tong. *Id*. Tong told Smyth-Riding that Lee does not like women to look him in the eyes and wants women to look at the ground and fold their hands when he is admonishing them.[12] *Id*.

B. Allegedly Racist Practices

Smyth-Riding also asserts that the Defendants showed favoritism for persons of Asian descent by providing them with "preferential treatment [and], better terms, conditions, and

---

[12] Tong denies that this conversation took place. ECF No. 64-2 at 11.

benefits of employment." *See* ECF Nos. 41 at 9; 70 at 11.  Smyth-Riding describes two incidents in support on this contention.

First, Smyth-Riding describes her involvement with Remy Cruz, an Asian, hired by the Defendants as an accountant.  ECF No. 41 at 9.  After determining that Cruz's performance did not meet requirements, Smyth-Riding had Cruz transferred to payroll. *Id.*  After the transfer, Cruz "retain[ed] the higher paying accountant's salary," and her supervisor was Joe.  *Id.* at 10. While working for payroll, Cruz made several mistakes that cost the Defendants large sums of money, including penalties for late tax filings.[13]  *Id.*

In 2008, payroll hired Zakia Harris, an African-American. *Id.*  Harris complained to the Defendants about Cruz's deficiencies.  *Id.*  Joe came to Smyth-Riding and asked her to approve the termination of Harris for performance issues.  ECF No. 70 at 12.  Smyth-Riding stated that Cruz had made many mistakes as well and was not being terminated.  *Id.*  Joe then claimed that "he wanted to fire Harris for creating the rumor that Cruz falsified her time."  *Id.*  Smyth-Riding opposed the termination and informed Serino of her position.  *Id.*  Harris was terminated and wrote to Smyth-Riding that she had been

---

[13] According to Smyth-Riding, Cruz's poor performance was frequently discussed by management, but Cruz was never issued a poor performance evaluation.  ECF No. 41 at 10.

discriminated against.  *See* ECF No. 80-1.  Smyth-Riding informed
Harris that there was no discrimination, and Harris was
terminated because she "did not successfully meet [the]
expectations of [her] introductory period."  *Id.*

Smyth-Riding complained to the Defendants about their
preference for Asian applicants after the Defendants hired Mabel
Ng as an Accounts Payable Specialist.  ECF No. 70 at 12.  Ng did
not have any accounts payable experience, but another applicant,
Carmen Medina,[14] did.  *Id.*  Joe hired Ng because he thought she
had the most potential.  *Id.*  Smyth-Riding complained to Joe,
Serino, and Castro about not hiring the most qualified candidate.
ECF No. 80-2 at 1.  In her email, Smyth-Riding specifically
mentioned potential issues with Title VII.[15]  *Id.*  When Smyth-
Riding spoke to Serino about her concerns, he told her to "get
over it."  ECF No. 70 at 13.  "Serino also intimated that the
discriminatory practices that favored Asians would continue by
stating that the replacement for [an Asian employee] [was] 'going
to look just like her.'"  *Id.*

---

[14] Medina is Hispanic.  ECF No. 70 at 12.

[15] Serino remembers the email and the "sugges[tion] that Title VII
could be an issue.  The company could be doing something not
right."  ECF No. 70-10 at 49.  Serino also recalls Smyth-Riding
"vent[ing] concerns" about employment law issues at staff
meetings.  *Id.* at 53-55.

In her human resources position, Smyth-Riding never filed a formal report about alleged gender or race discrimination at SESI.   ECF No. 80 at 6.

C. Defendants' Treatment of Smyth-Riding and Her Termination

During the events previously described,[16] other management employees began to notice the bad relationship between Joe and Smyth-Riding.[17]   Their friction made staff meetings awkward and difficult.[18]   *See* ECF No. 64-2 at 20-24, 33-35.   Serino and others admit that the problem was equally Joe's fault.   *See id.*   Serino never approached Smyth-Riding to discuss her relationship with Joe or any of his concerns.   *See* ECF No. 70 at 14.

In October 2008, Serino completed Smyth-Riding's year-end performance evaluation.   *See* ECF No. 70-5 at 1.   The evaluation had seven core competency categories: application of professional/technical knowledge, planning and organization, teamwork, service/initiative, accountability, communication, and flexibility.   *Id.* at 1-2.   Serino awarded Smyth-Riding the

---

[16] The parties do not state when this animosity began only that it began to show up at staff meetings.

[17] Smyth-Riding believes that Joe resented her position at SESI and her opposition to his hiring and firing practices.   *See* ECF No. 80-2 at 1.   The Defendants maintain that Joe and Smyth-Riding were having "a turf war . . . as to proper responsibility for hiring letters."   ECF No. 80 at 8.

[18] Serino also stated that before the problems with Joe, he was happy with Smyth-Riding's performance, he had no complaints about her performance, and she was a good member of the team.   *See* No. 64-2 at 20-24.

highest rating of "consistently exceeded expectations" in four of the seven categories.[19]  *Id.* at 2.  Smyth-Riding received a "sometimes exceeded expectations" in communication and "met expectations" in teamwork and accountability.  *Id.*

In November 2008, Smyth-Riding "advised [] Serino that she was extremely uncomfortable with [the Defendants'] reliance on protected bases[20] when hiring."  ECF No. 70 at 13.  She told Serino that "she did not want to appear on the cover of a newspaper in handcuffs because of [the Defendants'] unlawful practices."  *Id.*

In December 2008, Smyth-Riding coordinated the Defendants' holiday party.  ECF No. 41 at 18.  Although she planned the party, Smyth-Riding informed Serino, Castro, and Edward Sinclair[21] that she would not be able to attend because she was serving as the matron of honor at a wedding.  *Id.* at 18.  Smyth-Riding sent her husband to the holiday party in her place.  ECF No. 70-4 at 36-40 (deposition of Lee).  Lee was very upset that Smyth-Riding

---

[19] Serino noted that Smyth-Riding "deliver[ed] strong competence in the area of Human Resources every day.  She [had] initiative, drive, and a very strong loyalty to the Company."  ECF No. 70-5 at 3.

[20] By "protected bases," Smyth-Riding was referring to the Defendants' alleged use of age, gender, and race in hiring decisions.  *See* ECF No. 70 at 13.

[21] Sinclair is Caucasian and the Chief Executive Officer of SESI.  ECF No. 41 at 6.

did not attend. *Id.* Lee thought that it ruined the event and violated Smyth-Riding's job description.[22] *Id.* Castro thought that the party was "wonderfully successful" and "[w]onderfully executed." ECF No. 70 at 15. Castro was "taken [a]back" by Lee's reaction. *Id.*

In January 2009, a payroll department employee told Smyth-Riding that she would not receive a bonus for 2008.[23] ECF Nos. 41 at 19; 70 at 16. She received a pay raise of 1.7%. ECF No. 70 at 16. The average pay raise for the company was three to four percent. ECF No. 70 at 16. The raises and bonuses at SESI are discretionary, and the final decision is made by Lee.[24] *See* ECF Nos. 70 at 16; 80 at 12-13. Lee claimed that his decision about Smyth-Riding's bonus and raise was because of her "bad

---

[22] Smyth-Riding argues that the party was not part of her job responsibilities -- it was something she volunteered to do in 2007 and 2008. *See* ECF No. 41 at 18.

[23] Smyth-Riding also did not receive a bonus in 2007. ECF No. 70 at 14. Lee told the Plaintiff that she was not eligible for a bonus in 2007 because she had not been with the company a year, but Smyth-Riding later discovered that Asian employees who had been with the company for less than a year received bonuses. *Id.*
   When asked about the 2008 bonus, Smyth-Riding asserts that she was not paid commensurate to her performance and believes that everyone that did receive a bonus was treated more favorably. *See* ECF No. 64-2 at 13-15. However, she admits that African-Americans and females are in this group. *Id.* at 14-15.

[24] Serino says that Lee made all decisions about bonuses and raises, and he was not involved. ECF No. 70-10 at 57. However, Lee states that he gave final approval for the raise and bonus after discussions with Serino and Castro. ECF No. 70-4 at 330.

performance . . . during the year."[25]  *Id.*  When Smyth-Riding
tried to log into SESI's payroll system to perform her duties,
she discovered that her access had been revoked.  ECF Nos. 41 at
19; 70 at 16.

On January 6, 2009, Smyth-Riding sent a memorandum to Castro
and Sinclair about her lack of a bonus, small raise, and being
locked out of the company payroll system.  ECF No. 70 at 16.  On
January 9, 2009, Smyth-Riding met with Castro.  *Id.*  Castro
explained that the raise, bonus, and payroll system issues may
have been because of Smyth-Riding's bad relationship with Joe.[26]
*Id.*  At the meeting, Smyth-Riding asked that she be transferred
from Serino's supervision because "she felt uncomfortable with
his directions to violate employment discrimination laws with
respect to [the Defendants'] hiring practices" and that Lee's,
Joe's, and Serino's hiring practices "offended her."  ECF No. 70
at 13.

On January 12, 2009, the Defendants fired Smyth-Riding.  ECF
No. 70 at 17.  In her termination letter, the Defendants stated
that the reason for termination was "SESI no longer feels your

---

[25] Because of inflation, Lee believed that he actually gave Smyth-
Riding a "salary decrease" and from that alone she should have
realized that she was going to be terminated.  ECF No. 70 at 16.

[26] This was the first time Smyth-Riding heard that anyone in a
supervisory position felt that there was a problem with her
relationship with Joe.  *See* ECF No. 70 at 14.

personality fits with what is needed for this company and no longer feels it is in its best interest to continue your employment." ECF No. 70-8 at 2. The final decision to terminate Smyth-Riding was made by Lee. ECF No. 70 at 17. Lee asserts that the recommendation for the termination "was brought up from [] management."[27] ECF No.70-4 at 16. However, Serino denies having any involvement in the termination decision and "would have liked for [Smyth-Riding] to stay." ECF No. 70 at 18. Castro stated that he thought Smyth-Riding was doing a good job and he "didn't really understand why . . . she was being let go."[28] ECF No. 70-6 at 27. Before her termination, Smyth-Riding had never been reprimanded or counseled for poor performance. *See* ECF No. 70 at 14-15.

---

[27] Lee stated that the "major recommendation" came from Serino. ECF No. 70-4 at 122. After Serino, the recommendation had to go through Castro and Sinclair before reaching Lee. *Id*. According to Lee, Castro and Sinclair brought the completed termination letter to a meeting, Lee had never seen the letter before, and, only after reading the letter did he give "serious consideration" to eliminating Smyth-Riding's position. ECF No. 70-4 at 149-51. Castro denies having composed the termination letter. ECF No. 70-6 at 29.

[28] Castro asserts that he was not part of the termination process and was "very unhappy" with the decision.

D. Transferring Smyth-Riding's Responsibilities

On January 13, 2009, Castro sent an email to Sinclair asking if there was a plan to hire anyone new for the Columbia human resources position.[29]   ECF No. 70-9 at 2.   On January 14, 2009, Sinclair responded, describing a conversation that he had with Lee the day before.   ECF No. 70-9 at 1.   The Defendants planned on eliminating Smyth-Riding's position and transferring her responsibilities to Matt Boyett,[30] who was the Human Resources Manager at the Huntsville Facility.[31]   ECF Nos. 64-1 at 13; 70-9 at 1.   Boyett "became the HR person for the company as a temporary promotion . . . ."   ECF No. 70-10 at 65 (deposition of

---

[29] Castro stated that he knew they were transferring core human resources to Huntsville, but did not know if there was still a Columbia position.   ECF No. 70-9 at 2.

[30] Smyth-Riding hired Matt Boyett for an entry level human resources position and argues that he was undereducated and under experienced for the responsibilities he had after her departure. ECF No. 64-2 at 9.   Boyett's salary was approximately $50,000 a year.   ECF No. 64-1 at 13.

[31] "Russel and Dr. Lee and I talked this through in depth last night.   They are going with the plan we talked [about] yesterday. Floyd will take over as Director of Resources in Mar[ch] and we will put HR, financial planning/proposals, etc. and facilities under him.   So Matt Boyett will report to him for HR.   We will move the corporate HR functions in MD to HSV and I talked to Matt about making sure he has a good handle on those as Terri leaves . . . . *Need to ensure there is a good handoff* . . . to Matt.   I know he already was on most of it before.   Then as you need HR functions Matt can come up [to Columbia] and assist with recruiting, hiring, in processing, benefits, etc. *This is similar to what Terri did* . . . ."   ECF No. 70-9 at 1 (emphasis added).

Serino) ("[W]hen Terri departed, Matt was given the mission to serve in her function for the company . . . .").

A year later, the Defendants hired Steven Dwyer as Director of Human Resources.[32]  *See* ECF No. 80 at 2.  Dwyer's position was based in Huntsville.  *Id.*  Dwyer later left SESI, and Boyett "was anointed as the director of HR."  ECF No. 70-10 at 68.  The Defendants also hired human resources consultants whom they call on an as-needed basis.  ECF No. 64-2 at 51.

   E. Defendants' Explanations for the Termination

Although Smyth-Riding's termination letter stated that she was not a good "fit" for SESI, the Defendants have offered other reasons for her termination, including poor work performance and down-sizing.  *See* ECF No. 64-1 at 12-14.

The Defendants contend that the ultimate reason for Smyth-Riding's termination was that the company was having economic issues, they were down-sizing the Columbia facility, and it was more cost-effective to eliminate the director of human resources position.  *See* ECF no. 64-1 at 4.  According to Lee, one of SESI's large government projects was cancelled, leading to "a sharp decrease in revenue."  *Id.*  The number of employees at the Columbia facility "declined from 78 employees in July 2007, to 68 employees in 2009, to 44 employees in 2011."  *Id.*  Meanwhile, the

---

[32] Serino states that Sinclair hired Dwyer because the Defendants were trying to "find someone with [] credentials like [Smyth-Riding]."  ECF No. 70-10 at 66.

Huntsville facility continued to grow.  *See* ECF No. 80 at 24.
Lee asserted that Smyth-Riding did not have the "skill or
attitude" for any other position, the Defendants did not move her
to Huntsville because they did not want to pay her relocation
expenses, and her salary was significantly more than Boyett's.
*See* ECF No. 64-2 at 47-51.  Absent this loss of business and the
need to transfer human resources from the Columbia facility, Lee
stated that none of the other issues would have been enough to
terminate Smyth-Riding.  ECF No. 64-2 at 50.

The Defendants also assert that "[t]hroughout her employment
with SESI, [Smyth-Riding] was far from an exemplary employee."
ECF No. 64-1 at 3.  In addition to "shirk[ing] some of her core
responsibilities" by not attending the holiday party and her
friction with Joe, the Defendants contend that Smyth-Riding
committed timecard fraud.  *Id.* at 3-4.  Smyth-Riding would
allegedly come in late or leave early and still record an eight-
hour workday.[33]  Smyth-Riding was never reprimanded or spoken to
about timecard fraud during her employment.  *See id.*; ECF No. 70
at 15-16.

---

[33] In his depositions, Serino stated that there were issues with
Smyth-Riding's timecard.  ECF No. 64-2 at 27-29.  Lee states that
Serino told him about these issues.  ECF No. 64-2 at 47.  The
Defendants also include a chart detailing the dates and times of
the alleged timecard fraud.  *Id.* at 57.  This chart was included
in the Defendants' interrogatory answers, but they do not include
the source for the dates and times.  *See id.*; ECF No. 70 at 15-
16.

When questioned about Smyth-Riding's allegedly poor job
performance, Lee stated that she was "disrupt[ing] corporate
business" and "wasted corporate resources" by speaking to
employees and "telling them privately that -- [] [the] company
[was] mistreating them, mishandling their compensation, and so
on."[34]  ECF No. 70-4 at 18-21.  Lee said that "disrupting
corporate business" was one of the reasons Smyth-Riding was
terminated.  *Id.* at 20.

   F. Procedural History

   On July 9, 2009, Smyth-Riding filed a charge of
discrimination with the Maryland Human Rights Commission.  ECF
No. 41 at 3.  The case was transferred to the EEOC for
processing.  *Id.*  The EEOC "failed to reach a finding," so it
issued Smyth-Riding a right to sue letter on December 1, 2010.
*Id.* at 3-4.

   On March 1, 2011, Smyth-Riding filed suit against SESI and
Lee.  ECF No. 1.  On July 25, 2012, Smyth-Riding filed her second
amended complaint alleging employment discrimination and

---

[34] Lee also stated that Smyth-Riding was battling with Joe about
how the company treated employees, that Joe told him about these
incidents, and Smyth-Riding was trying to "stir[] up" her own
case or lawsuit.  ECF No. 70-4 at 21-23, 32.  Lee also admitted
to hearing about "an incident of [Smyth-Riding] bickering with
Daniel Joe [] about . . . certain people [] not getting fair
compensation."  ECF 70-4 at 301.

retaliation.[35]   ECF No. 41.   On December 23, 2013, the Defendants moved for summary judgment.   ECF No. 64.   On February 21, 2014, Smyth-Riding opposed the motion.   ECF No. 70.   On April 8, 2014, the Defendants replied.   ECF No. 80.

II. Analysis

  A. Legal Standard

    1. Summary Judgment

    The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ.

---

[35] Smyth-Riding alleges fifteen causes of action: discharge on the basis of race in violation of 42 U.S.C. § 1981 (against all Defendants), retaliatory discharge in violation of 42 U.S.C. § 2000e-3 (against all Defendants), discriminatory discharge on the basis of race in violation of 42 U.S.C. § 2000e-2 (against SESI), discriminatory discharge on the basis of sex in violation of 42 U.S.C. § 2000e-2 (against SESI), discriminatory denial of a pay bonus on the basis of race in violation of 42 U.S.C. § 1981 (against all Defendants), retaliatory denial of a pay bonus in violation of 42 U.S.C. § 2000e-3 (against SESI), discriminatory denial of a pay bonus on the basis of race in violation of 42 U.S.C. § 2000e-2 (against SESI), discriminatory denial of a pay bonus on the basis of sex in violation of 42 U.S.C. § 2000e-2 (against SESI), discriminatory denial of a pay raise on the basis of race in violation of 42 U.S.C. § 1981 (against all Defendants), retaliatory denial of pay raise in violation of section 42 U.S.C. § 2000e-3 (against SESI), discriminatory denial of a pay raise on the basis of race in violation of 42 U.S.C. § 2000e-2 (against SESI), discriminatory denial of a pay raise on the basis of sex in violation of 42 U.S.C. § 2000e-2 (against SESI), retaliatory discharge in violation of 42 U.S.C. § 1981 (against all Defendants), retaliatory denial of a pay bonus in violation of 42 U.S.C. § 1981 (against all Defendants), and retaliatory denial of a pay raise in violation of 42 U.S.C. § 1981 (against all Defendants).   ECF No. 41 at 22-35.

P. 56(a).[36]  In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [her] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

B. The Plaintiff's Substantive Discrimination Claims

A plaintiff can prove her employer's discrimination through one of two methods.  *See Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284 (4th Cir. 2004).  First, she may use "any direct or indirect evidence relevant to and sufficiently probative of the issue," under "ordinary principles of proof."

---

[36] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment."  Fed. R. Civ. P. 56 advisory committee's note.

*Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (internal quotation marks omitted).  To avoid summary judgment, the plaintiff must produce "direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (internal quotation marks omitted).

Absent direct evidence of discrimination, the Court applies the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the plaintiff must first establish a prima facie case of discrimination.  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  If she does, "a presumption of illegal discrimination" arises, and the burden of production shifts to the employer to articulate a nondiscriminatory reason for its adverse decision. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). "If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981), and the *McDonnell Douglas* framework "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  The plaintiff must then prove by a preponderance of the evidence that "the proffered reason was not the true reason for the employment decision," and that the true reason was discrimination. *Burdine*,

450 U.S. at 256.  She may do this directly or indirectly, by

"persuading the court that a discriminatory reason more likely

motivated the employer" or by showing that the employer's

explanation is "unworthy of credence."  *Id.*

> 1. Denial of a Bonus (Counts 5,7, 8) and a Pay Raise (Counts
>    9, 11, 12)

Smyth-Riding contends that the Defendants discriminated

against her when they only raised her pay by 1.7% and denied her

bonus in 2008.  ECF No. 41 at 22-35.  The Defendants argue that

they are entitled to summary judgment because Smyth-Riding cannot

establish a *prima facie* case of discrimination, and her poor job

performance provides a non-discriminatory reason for their

actions.  ECF No. 64-1 at 11-14.

To establish a *prima facie* case of employment

discrimination, Smyth-Riding must show 1) she is a member of a

protected class, 2) she suffered an adverse employment action, 3)

at the time of the action, she was meeting her employer's

legitimate expectations, and 4) she was treated differently from

other similarly situated persons who were not members of the

protected class.  *Pulley v. KPMG Consulting, Inc.*, 348 F. Supp.

2d 388, 394 (D. Md. 2004).  Smyth-Riding is African-American and

female.  ECF No. 41 at 1.  Thus, she is a member of protected

classes.  The Defendants contend that Smyth-Riding cannot

establish the other three elements of a *prima facie* case.   *See*
ECF No. 64-1 at 11-14.

For substantive discrimination claims, an adverse employment
action must "adversely affect the terms, conditions, or benefits
of the plaintiff's employment."  *James v. Booz-Allen & Hamilton,*
*Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2004) (internal quotations
omitted).  Adverse employment decisions include "ultimate
employment decisions" such as "hiring, granting leave,
discharging, promoting and compensating."  *Pulley*, 348 F. Supp.
2d at 394 (*quoting Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.
1981)).  If the employer's conduct falls short of an ultimate
employment decision, the plaintiff must show "a tangible effect
on the terms and conditions of employment."  *Geist v.*
*Gill/Kardish P'ship, LLC*, 671 F. Supp. 2d 729, 737 n. 6 (D. Md.
2009).  "[T]he salient 'question is whether there was a change in
the terms or conditions of [the plaintiff's] employment which had
a significant detrimental effect on [her] opportunities for
promotion or professional development."  *Skeete v. N. Am.*
*Partners in Anesthesia, LLP*, No. ELH-10-02704, 2012 WL 27181, at
*9 (D. Md. Jan. 4, 2012) (*quoting James*, 368 F.3d at 376
(internal quotations and citation omitted)).

"As a matter of law . . . the non-receipt of a discretionary
bonus does not constitute an adverse employment action."
*Schamann v. O'Keefe*, 314 F. Supp. 2d 515, 531 (D. Md. 2004)

23

(retaliation claim); *see also Stoyanov v. Mabus*, No. DKC-07-1953, 2013 WL 1104978, at *10 (D. Md. March 15, 2013); *Lawrence v. Geren*, No. JFM-07-3455, 2008 WL 4680566, at *1 (D. Md. Oct. 17, 2008).   In *Lawrence*, the court recognized that "there might be circumstances under which this general rule should not be applied . . . .), citing *Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001), in support.[37]   2008 WL 4680566, at *1.   In Russell, the D.C. Circuit noted that the plaintiff's bonus was directly tied to her performance rating and that it was not truly discretionary.   257 F.3d at 19.

Here, Smyth-Riding was not contractually entitled to a bonus, and she did not allege that SESI policy directly links bonuses with performance ratings as in *Russell*.   *See* ECF Nos. 70 at 16; 80 at 12-13.   The denial of her 2008 bonus is not an adverse employment action.

The denial of a pay increase may be an adverse employment action.   *See McClintock v. Leavitt*, No. RDB-05-2880, 2007 WL 927616, at *5 (D. Md. Mar. 26, 2007) (a discretionary bonus is not an adverse employment action, but a Quality Step Increase that permanently alters the pay scale is); *Obi v. Anne Arundel Cnty.*, 142 F. Supp. 2d 655, 674 (D. Md. 2001) ("Denial of a pay increase would obviously constitute a "materially adverse

---

[37] *Russell* discusses the possibility that an employer could "award $500 bonuses to all white employees and $1 to all similarly situated black employees . . . ."   257 F.3d at 819.

employment action"). The Defendants argue that Smyth-Riding was not denied a pay increase -- she received a raise, just not one she deemed sufficient. *See* ECF No. 64-1 at 12. Smyth-Riding contends that because of inflation, the average increase at SESI, and Lee's statement that 1.7% was actually a "salary decrease," the Defendants' decision was an adverse employment action. ECF No. 70 at 16. However, even if Smyth-Riding could establish a *prima facie* case, she has failed to establish pretext. *See St. Mary's Honor Ctr.*, 509 U.S. at 511.

The Defendants contend that the low raise and the lack of bonus were caused by Smyth-Riding's poor performance. ECF No. 70 at 16. There is a material issue of fact about whether Smyth-Riding was meeting the Defendants' expectations.[38] However, this alone is not sufficient. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000) ("It is not enough . . . to disbelieve the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (*quoting St. Mary's Honor Ctr.*, 509 U.S. at 519). Smyth-Riding must show that a reasonable jury could find by a preponderance of the evidence that discriminatory animus was a motivating factor in the denial of the bonus and poor raise. *See id.* Smyth-Riding has not carried this burden. She believes

---

[38] *See infra* Part II.B.2.

that anyone who had a similar performance evaluation and received a bonus or a raise was treated more favorably. *See* ECF No. 64-2 at 13-15. Smyth-Riding admits that this group included African-Americans and women.[39] *See id*. Accordingly, the Court will grant summary judgment on Counts 5, 7, 8, 9, 11, and 12.

2. Discriminatory Discharge (Counts 1, 3, 4)

Smyth-Riding asserts that the Defendants terminated her employment because of her gender and race. ECF No. 41 at 22-34. She does not present direct evidence of discrimination; instead, she claims that SESI had a discriminatory culture against women and individuals who were not of Asian descent. *See* ECF No. 64-2 at 8, 10. The Defendants argue that Smyth-Riding has failed to establish a *prima facie* case of discrimination because she was not replaced by someone outside her protected class. *See* ECF No. 64-1 at 7-8. The Defendants also assert that the financial difficulties at SESI and the elimination of the Columbia human resources department are non-discriminatory reasons for the discharge. *Id*. at 9.

---

[39] Additionally, Smyth-Riding has not presented any facts showing that persons outside the protected classes who received a bonus or better raise were performing similar work to her. *See Zackrie v. Lockheed Martin, Corp.*, No. RWT-04-1864, 2006 WL 2849767, at *4 (D. Md. Oct. 2, 2006); *see also Phillips v. Raytheon Applied Signal Tech., Inc.*, No. ELH-11-3230, 2013 WL 5440802, at *5 (D. Md. Sept. 27, 2013) (plaintiff claimed that his pay raise was insufficient compared to other employees and the increase of the cost of living, but the court granted summary judgment because the plaintiff did not show that others were treated more favorably.)

To establish a *prima facie* case for discriminatory discharge, Smyth-Riding must show 1) that she is a member of a protected class, 2) she was terminated, 3) when terminated she was meeting her employer's expectations, and 4) her position remained open, or she was replaced by a person outside the protected class. *Hill*, 354 F.3d at 285. There is an inference against discrimination when the individual who hired the plaintiff is the person who fired her. *Hall v. Quest Mgmt. Grp., LLC*, No. ELH-11-2190, 2012 U.S. Dist. LEXIS 120575, at *29 (D. Md. Aug. 23, 2012).

Smyth-Riding has established a material issue of fact about whether she was meeting the Defendants' expectations. Although the Defendants contend that she "was far from an exemplary employee" and was "shirk[ing] some of her core responsibilities,"[40] Smyth-Riding received an exemplary end of the year performance evaluation from Seriňo three months before her termination. *See* ECF No. 70-5 at 1-2; *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 408 (4th 2005) (conflict between performance review and testimony showed pretext); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331-32 (3d Cir. 1995) ("fully acceptable" performance rating and past sales performance created a genuine issue of material fact on whether

---

[40] ECF No. 64-1 at 3-4.

27

plaintiff was performing poorly).   There are also disputes about whether attending the holiday party was part of Smyth-Riding's duties,[41] if the party was a success,[42] whether Smyth-Riding committed timecard fraud,[43] and which supervisors asserted that she was not meeting company expectations.[44]   Smyth-Riding does not depend on her subjective evaluation of her performance, she cites other sources to establish a material issue of fact.   *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (the self-assessment of the plaintiff is irrelevant); *Hall*, 2012 U.S. Dist. LEXIS 120575, at *28.

---

[41] The party is not a part of the job description provided to Smyth-Riding, and she states that she volunteered to help.  *See* ECF Nos. 41 at 18; 64-2 at 16.   However, the job description states that it is not exhaustive, and Lee asserts that the holiday party was a human resources responsibility.  *See* ECF Nos. 64-2 at 16; 70-4 at 36-40.

[42] Lee asserts that the party was a failure, but Castro describes the event as "wonderfully successful" and "[w]onderfully executed."   ECF Nos. 70 at 15; 70-4 at 36-40.

[43] Smyth-Riding was never reprimanded for coming in late or leaving early, and the Defendants do not clearly describe the source of their table of allegedly fraudulent time card activities.  *See* ECF Nos. 70 at 15-16; 70-5 at 1-2.

[44] Lee contends that it was Serino who originally recommended Smyth-Riding's termination, and that Serino and Castro crafted her termination letter.  ECF No.70-4 at 16, 122.   Serino and Castro deny being part of the process and say they wanted Smyth-Riding to stay with the company.   ECF Nos. 70 at 18; 70-6 at 27.

The Defendants argue that Smyth-Riding cannot establish the fourth element of discriminatory discharge because "SESI has not hired anyone for the position of Director of Human Resources *in its Columbia, Maryland facility.*"[45]   ECF No. 80 at 1 (emphasis added).   The *McDonnell Douglas prima facie* case requirements are "not necessarily applicable in every respect to differing factual situations."   *McDonnell Douglas Corp*, 411 U.S. at 802 n. 13; *see also Witten v. A.H. Smith & Co.*, No. M-82-3198, 1984 WL 1125, at *3 (D. Md. Oct. 10, 1984) (*McDonnell Douglas* was not meant to be "rigid").   Courts have consistently cautioned about becoming overly concerned with the "minutiae" of the framework.[46]   For example, in *Miles v. EEOC*, 429 F.3d 480 (4th Cir. 2005), the Fourth Circuit determined that the fourth element would be inapplicable in cases in which an employer hired an individual from the protected class in order to disguise his discrimination. *Id.* at 488-89.

---

[45] The Defendants also state that "although Steve Dwyer held the title of Director of HR, he too was employed by SESI at its Huntsville location, and was not hired by SESI until approximately one year following [Smyth-Riding's] termination." ECF No. 80 at 1.

[46] *See, e.g., Burns v. AAF-McQuay Inc.*, 96 F.3d 728, 732 (4th Cir. 1996); *Malina v. Balt. Gas & Elec. Co.*, 18 F. Supp. 2d 596, 606 (D. Md. 1998).

In this case, there is a material issue of fact about whether SESI replaced Smyth-Riding.  Although the Defendants contend that they never filled the Columbia position, Smyth-Riding has presented evidence that her job duties were transferred to Matt Boyett, a Caucasian male.[47]  *See Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000) (defendant "constructively replaced" the plaintiff when it eliminated her position and transferred her responsibilities to a person outside the protected class).  Additionally, the Defendants hired Dwyer a year later and gave him the title of Director of Human Resources.  ECF No. 80 at 1.  According to Serino, the Defendants hired Dwyer because they were looking for someone with qualifications similar to Smyth-Riding.  ECF No. 70-10 at 66.  If the Court were to adopt the Defendants' narrow interpretation of the fourth element -- that Smyth-Riding must show that the Defendants filled her position at Columbia -- employers would be able to disguise discriminatory animus by eliminating a position and transferring all the plaintiff's responsibilities to another location.  *Cf. Miles*, 429 F.3d at 488-89[48]

---

[47] *See* ECF Nos. ECF No. 70-9 at 1 (Sinclair email); 70-10 at 65.

[48] Smyth-Riding also argues that, even if she did not show that the defendants replaced her with someone outside her class, she has met the *prima facie* requirements for a reduction-in-force case.  *See* ECF Nos. 70 at 25; 80 at 9.  The fourth element in a

Having established a *prima facie* case, the burden of
production shifts to the Defendants to provide a non-
discriminatory reason for Smyth-Riding's termination. *Hoyle*, 650
F.3d at 336.  The Defendants carry this burden by explaining that
the Defendants needed to save money by eliminating the Columbia
human resources position, and Smyth-Riding was more expensive
than Boyett.[49]  ECF No. 64-1 at 8-10.

Smyth-Riding has presented sufficient evidence that the
reasons provided by the Defendants are "unworthy of credence."
*See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th
Cir. 2007).  The Defendants have been inconsistent about who made

---

reduction-in-force case is that the plaintiff must establish that
the defendant "did not treat the protected status neutrally, or
there were other circumstances giving rise to an inference of
discrimination."  *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d
716, 720-21 (4th Cir. 2002).  "What is critical with respect to
the fourth element is that the plaintiff demonstrate [s]he was
not hired (or fired or not promoted, etc) 'under circumstances
which give rise to an inference of unlawful discrimination.'"
*EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n. 2 (4th Cir.
2001) (*quoting Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S.
248, 253 (1981)).

Although the Court has determined that Smyth-Riding has
established the fourth element for a normal discriminatory
discharge case, she has also shown that there "were circumstances
giving rise to an inference of discrimination" based on her
gender for the reasons discussed in the Court's pretext analysis.

[49] The Defendants also contend that Smyth-Riding's poor job
performance provides a non-discriminatory reason for employment.
ECF No. 80 at 16-17.  Because the Court rejected this argument in
relation to the Plaintiff's *prima facie* case, it will not be
addressed here.

Case 1:11-cv-00558-JFM   Document 81   Filed 09/29/14   Page 32 of 43


the decision to terminate Smyth-Riding[50] and the reason for the termination.[51] *See, e.g., Sears Roebuck*, 243 F.3d at 852-53 ("Indeed, the fact that Sears has offered different justifications at different times . . . is, in and of itself, probative of pretext."). However, "[i]t is not enough . . . to disbelieve the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 146-47. In other words, Smyth-Riding must establish that a reasonable jury could find by a preponderance of the evidence that discriminatory animus was a motivating factor for her termination. *See Hill*, 354 F.3d at 297-98. To carry this burden, Smyth-Riding cites SESI's "discriminatory culture". *See* ECF Nos. 64-2 at 8, 10; 70 at 24-25.

A reasonable jury could determine that Smyth-Riding's gender was a motivating factor in her termination. Smyth-Riding has alleged many incidents in which she and other female employees

---

[50] *See, supra,* note 44.

[51] Smyth-Riding's termination letter said that she was eliminated because she was not a "good fit" for the company. ECF No. 70-8 at 2. Castro and Serino did not understand her termination. ECF Nos. 70 at 18; 70-6 at 27. Lee admitted that Smyth-Riding's alleged performance issues were insufficient to cause her termination. ECF No. 64-2 at 50. Only after her termination did the Defendants assert their economic necessity argument. *See* ECF No. 64-1 at 8-10; 70 at 27-28. Sinclair's email implies that the Defendants may have not had a complete plan to eliminate the Columbia human resources department until after Smyth-Riding was terminated. ECF No. 70-9 at 1-2.

faced gender-based comments,[52] the Defendants used gender as a
factor in the hiring process,[53] and female employees were treated
differently from male employees.[54]  Many of the alleged comments
came from Serino.  *See* ECF No. 70 at 8-11.  According to Lee, it
was Serino who made the recommendation to terminate Smyth-Riding.
ECF No.70-4 at 16, 122.  Serino and Castro brought Lee the
termination letter and, until then, Lee had not seriously
considered terminating Smyth-Riding.  ECF No. 70-4 at 149-51.
Additionally, one of the Defendants' issues with Smyth-Riding's
job performance was her poor relationship with Joe.[55]  Serino and
Castro admitted that Joe was equally responsible for the problem,
but Joe never faced disciplinary action and was not terminated.
*See* ECF No. 64-2 at 20-24, 33-35.  This evidence is sufficient

---

[52] These include comments about female employees' and applicants'
age and family status, *see, e.g.*, ECF No. 70-3 at 7-8; the proper
role of men in the workplace, *see* ECF 70 at 9-10; and how women
refused to listen to the direction of men, *see* ECF Nos. 41 at 8;
70 at 10.

[53] *See* ECF No. 70 at 8-10.

[54] *See* ECF No. 70 at 8-11.  In one incident, Joe allegedly told a
woman that he should "punch her in the face" because she tricked
him into believing she was pregnant, ECF No. 70 at 11, and a
female employee allegedly informed Smyth-Riding that she should
keep her eyes on the ground and hands folded if Lee was ever
angry at her, ECF No. 64-2 at 11.

[55] Although the Defendants argue that the holiday party and
timecard fraud also show poor job performance, Castro and
Sinclair stated that Smyth-Riding was doing a good job, and the
only issue they had was the friction between her and Joe at staff
meetings.  *See* ECF No. 64-2 at 20-24, 33-35.

for Count 4 to survive summary judgment. *See, e.g., Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) ("Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff."); *Conway v. Electro Switch Corp.*, 825 F.2d 593, 600 (1st Cir. 1987) (evidence of social displays of favoritism and sexism supported a verdict of discriminatory conduct).

Compared to her gender discrimination claim, Smyth-Riding presented very little evidence supporting her allegation of racial discrimination.  Smyth-Riding's support for this claim was the termination of Harris, which she said was not for discriminatory reasons[56] and that Joe hired an Asian individual for his department over a Hispanic candidate who Smyth-Riding thought was better qualified.[57]  Smyth-Riding also contends that Asian employees unfairly received bonuses in 2007 when she did not, but provides no evidence to support this contention. *See* ECF No. 70 at 14.  Accordingly, the Court will grant summary judgment on Counts 1 and 3.

---

[56] *See* ECF No. 80-1 (letter to Harris).

[57] *See* ECF No. 70 at 12.

C. The Plaintiff's Retaliation Claims[58]

Smyth-Riding alleges that the denial of her 2008 bonus, her low pay raise, and her discharge were the result of retaliation because she objected to the Defendants' discriminatory hiring practices. *See* ECF No. 70 at 34.   To establish a *prima facie* case of retaliation, Smyth-Riding must show 1) that she engaged in a protected activity; 2) her employer took an adverse employment action against her; and 3) there was a causal link between the protected activity and adverse action.   *Navy Fed. Credit Union*, 424 F.3d at 406.

   1. Participation in a Protected Activity

The Defendants argue that Smyth-Riding did not engage in a protected activity because none of the Defendants' actions was unlawful.   ECF No. 80 at 17.   There are two categories of protected activity -- opposition and participation.   *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Participation includes "making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing." *Betof v. Suburban Hosp.*, No. DKC-11-1452, 2012 WL 2564781, at *10 (D. Md. June 29, 2012).   Opposition is a much broader category and includes "staging informal protests and voicing one's own opinions in order to bring attention to an employer's

---

[58] Denial of a bonus (Counts 6 and 14), insufficient pay raise (Counts 10 and 15), and retaliatory discharge (Counts 2 and 13).

discriminatory activities,"[59] or "complain[ing] to [] superiors about suspected violations . . . ."[60]

The Defendants argue that because Smyth-Riding has failed to establish "unlawful" conduct, she cannot succeed in her retaliation claim because there was nothing for her to oppose. *See* ECF No. 80 at 17.  The relevant inquiry is not whether the Defendants actually participated in unlawful actions, but "1) whether the plaintiff subjectively (in good faith) believed that the defendant engaged in an unlawful action; and 2) whether this belief was objectively reasonable in light of the facts." *Betof*, 2012 WL 2564781, at *10.

Smyth-Riding has alleged several instances in which she complained to Serino, Sinclair, and Castro about SESI's hiring practices based on age, gender, and race.[61]  Serino remembers Smyth-Riding addressing possible Title VII issues in an email to Joe.  *See* ECF No. 70-10 at 49.  Sinclair and Castro recall Smyth-Riding discussing her concerns at staff meetings,[62] and she objected to the questions posed to female applicants during

---

[59] *Laughlin,* 149 F.3d at 259.

[60] *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003).

[61] *See, e.g.*, ECF Nos. 70 at 8, 10-13; 70-4 at 18-21; 70-6 at 7-8, 11, 33; 70-10 at 49.

[62] *See* ECF Nos. 70-6 at 7-8, 11, 33; 70-10 at 53-55.

interviews.[63]   Although the Defendants argue that Smyth-Riding
never filed reports about any of the alleged incidents,[64] these
facts are sufficient for a reasonable jury to determine that
Smyth-Riding opposed the Defendants' hiring practices and
employment decisions.  *See Gibson v. Marjack Co.*, 718 S. Supp. 2d
649, 654 (D. Md. 2010)("[T]he opposition clause protects a wide
range of activities, including unofficial protests and the use of
informal grievance procedures . . . .  Thus, an employee's
comments to an employer complaining about discriminatory
practices constitute opposition . . . ."); *see also Navy Fed.
Credit Union*, 424 F.3d at 407.

    2. Adverse Employment Action

The definition of an adverse employment action in a
retaliation case differs from the definition in a substantive
discrimination case.  *See Thorn v. Sebelius*, 766 F. Supp. 2d 585,
598, 603 (D. Md. 2011).  For substantive discrimination, the
employer's action must have "a tangible effect on the terms and
conditions of employment."  *Geist,* 671 F. Supp. 2d at 737 n. 6.
In retaliation suits, "adverse employment action" covers a
broader range of conduct -- "actions that would have been
materially adverse to a reasonable employee or job applicant."
*Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 57 (2006).  "[T]he

---

[63] *See* ECF Nos. 70 at 8; 70-6 at 7-8.

[64] *See* ECF No. 80 at 6.

employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*

Despite this broader definition, courts have held that the denial of a purely discretionary bonus cannot be an adverse employment action.[65] *See, e.g., Schamann*, 314 F. Supp. 2d at 531. Accordingly, the Court will grant summary judgment on Counts 6 and 14. Denying a pay raise[66] and termination[67] are adverse employment actions because they would dissuade employees from reporting discrimination.

### 3. Causal Nexus

The Defendants argue that Smyth-Riding cannot establish the required causal nexus because Lee did not know of her protected activities when she was terminated, and retaliation was not the but-for cause of her termination. *See* ECF No. 64-1 at 15-17.

"Knowledge of [protected activity] is essential to a retaliation claim." *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998). If a plaintiff cannot establish that the decision-maker had knowledge of the protected activity at the time of the

---

[65] *See Stoyanov*, 2013 WL 1104978, at *10; *McClintock*, 2007 WL 927616, at *5; *Schamann*, 314 F. Supp. 2d at 531.

[66] *See McClintock*, 2007 WL 927616, at *5. Lee thought the pay raise was so low that it was actually a decrease in pay and should have warned Smyth-Riding that she was about to be terminated. *See* ECF No. 70 at 16.

[67] *See Gibson*, 718 S. Supp. 2d at 655.

adverse employment action, her retaliation claim must fail.  *See*

*Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir.

1998).  Because Smyth-Riding only allegedly reported her

discrimination concerns to Serino, Castro, Sinclair, and Joe, the

Defendants assert that Lee did not have knowledge at the time of

the termination.  *See* ECF No. 64-1 at 16-17.

Smyth-Riding has established two material issues of fact in

response to the Defendants' argument.  First, it is unclear

whether Lee was the ultimate decision maker for the raise and the

termination.  Although Sinclair and Castro state that they were

not involved in the process and that Lee was solely responsible,[68]

Lee states that the recommendation to terminate Smyth-Riding

started with Serino.[69]  Serino and Castro brought a completed

termination letter to Lee, and only then did Lee consider firing

Smyth-Riding.  *See* ECF No. 70-4 at 149-51.  Lee also stated that

bonuses and raises went through Serino and Castro first.  *See* ECF

No. 70-4 at 330.  Smyth-Riding has presented facts supporting her

allegation that she reported discrimination to Castro and

Sinclair.[70]  If Lee merely signed off on Sinclair and Castro's

retaliatory decision, then Smyth-Riding can still establish a

---

[68] *See* ECF Nos. 70 at 18; 70-6 at 27-29; 70-10 at 57.

[69] *See* ECF No. 70-4 at 122, 149-51, 330.

[70] *See, e.g.*, ECF Nos. 70 at 8, 10-13; 70-4 at 18-21; 70-6 at 7-8, 11, 33; 70-10 at 49.

retaliation claim. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194-95 (2011); *Hill*, 354 F.3d at 290.

Smyth-Riding has also presented facts that Lee had knowledge of her protected activities when she was terminated. During his deposition, Lee stated that Smyth-Riding "disrupt[ed] corporate business" and "wasted corporate resources" by speaking to employees and "telling them privately that -- [] [the] company [was] mistreating them, mishandling their compensation, and so on."[71] ECF No. 70-4 at 18-21. Lee also stated that Smyth-Riding was battling with Joe about how the company treated employees, that Joe told him about these incidents, and Smyth-Riding was trying to "stir[] up" her own case or lawsuit. ECF No. 70-4 at 21-23, 32. Lee admitted that "disrupting corporate business" was one of the reasons Smyth-Riding was terminated. *Id.* at 20. Thus, Smyth-Riding has produced sufficient facts for a jury to conclude that Lee had knowledge of the protected activity.

The Defendants also contend that Smyth-Riding cannot demonstrate but-for causation. *See* ECF No. 80 at 20. Unlike substantive discrimination claims that only require that

---

[71] Lee also stated that Smyth-Riding was battling with Joe about how the company treated employees, that Joe told him about these incidents, and Smyth-Riding was trying to "stir[] up" her own case or lawsuit. ECF No. 70-4 at 21-23, 32. Lee also admitted to hearing about "an incident of [Smyth-Riding] bickering with Daniel Joe [] about . . . certain people [] not getting fair compensation." ECF 70-4 at 301.

discriminatory animus be a motivating factor,[72] the plaintiff in a retaliation suit must establish that the adverse employment action would not have occurred absent the protected activity.[73]  A plaintiff can carry this burden by showing "close temporal proximity between the time her employer learned about her protected activity and her discharge . . . ."  *Hubbard v. Ga. Farm Bureau Mut. Ins. Co.*, No. 5:11-CV-290 (CAR), 2013 WL 3964908, at *1 (M.D. Ga. July 31, 2013); *see also Foster v. Univ. of Md. E. Shore*, No. TJS-10-1933, 2013 WL 5487813, at *5-6 (D. Md. Sept. 27, 2013).

Although the parties do not provide dates for a large portion of Smyth-Riding's activities, it appears that most of her protected activity was between January 2008 and January 2009.[74] Smyth-Riding establishes that she received a superior performance review in October 2008,[75] complained about discriminatory practices to Serino in November,[76] was denied a bonus and received

---

[72] *See Hill*, 354 F.3d at 297-98.

[73] *See Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517, 2533 (2013).

[74] Smyth-Riding allegedly complained of discrimination to Serino on several occasions.  *See* ECF No. 70 at 9-11.  Serino was only her direct supervisor from January 2008 to January 2009.  ECF No. 41 at 5.

[75] *See* ECF No. 70-5 at 1-2.

[76] ECF No. 70 at 13.

a poor pay raise in January for "bad performance,"[77] complained to
Castro about discrimination and requested to be transferred from
Serino's supervision on January 9, 2009,[78] and was terminated
three days later.[79]  Additionally, in his deposition, Lee states
that Smyth-Riding's attempts to "disrupt corporate business" was
a reason for her termination.[80]  ECF No. 70-4 at 18-21.  A
reasonable jury could conclude that but-for Smyth-Riding's
complaints about discriminatory practices, she would not have
been terminated and would have received a higher raise.  *See*
*Betof*, 2012 WL 2564781, at *11.

Because Smyth-Riding has established a *prima facie* case of
retaliation, the burden of production shifts to the Defendants to
provide a non-discriminatory reason for their actions.  *Hoyle*,
650 F.3d at 336.  The Defendants assert the same non-
discriminatory reasons as for Smyth-Riding's substantive
discrimination claims--the need to eliminate the Columbia human
resources department and Smyth-Riding's poor job performance.

---

[77] ECF Nos. 41 at 19; 70 at 16.

[78] ECF No. 70 at 16.

[79] ECF No. 70 at 17.

[80] Although Lee stated that "disrupting corporate business" was *a*
reason for the termination, not *the* reason, Lee's true motivation
and credibility are issues for a jury to decide.  *See Okwa v.*
*Harper*, 757 A. 2d 118, 127 (Md. 2000) ("[S]ummary judgment is
generally inappropriate when matters such as knowledge, intent,
and motive are at issue.").

*See* ECF No. 80 at 22-24.  Because the Court rejected these arguments in the pretext analysis of the substantive discrimination claims, it will not be addressed here.

Accordingly, the Court will deny the Defendants' motion for summary judgment on Smyth-Riding's retaliation claims.

III. Conclusion

For the reasons stated above, the Defendants' motion for summary judgment will be granted in part and denied in part.

_9/29/14_____
Date

_____
William D. Quarles, Jr.
United States District Judge